OKLAHOMA CONTRACTING CO., Inc. v.
MAGNOLIA PIPE LINE CO.

No. 13268.

United States Court of Appeals
Fifth Circuit.

March 22, 1952.

Rehearing Denied June 18, 1952.

392

William S. Campbell, Roy H. Callahan, Dallas, Tex., for appellant.

Ross Madole, Roswell, N. M., Chas. B. Wallace, Dallas, Tex., for appellee.

Before BORAH, RUSSELL, and RIVES, Circuit Judges.

RUSSELL, Circuit Judge.

The litigation from which this appeal emerges involved many items of controversy, but the appeal itself involves only three main questions, as presented by the appellant's numerous assignments of error, of whether the trial Court erred in denying the counter-claim of appellant for approximately one million and a half dollars damages which appellant asserted against appellee; whether there was error in refusing to sustain the appellant's motions to dismiss the complaint of appellee for the recovery of some $268,000, and for a declaration of non-liability of appellee to appellant upon any and all claims arising out of their contractual relationship; and whether the trial Court erred in denying the appellant's request for a jury trial. The contentions are asserted in the order stated and since a discussion of the case is necessary to present the substance and claims of the rulings denying the motions to dismiss and the request for a jury trial we deal with the questions in the order in which they are presented to us.

■ The parties will sometimes be referred to as Oklahoma and Magnolia. On April 11th, 1947, Magnolia issued invitations for bids on any one or all of six sections of its projected 650 mile, 20 inch crude oil pipe line extending from Corsicana, Texas through Arkansas and Missouri to Patoka, Illinois. Each prospective bidder was furnished with a 23 page mimeographed copy of the general specifications. These specifications set forth under the title of "Location of Work" each of the six sections covering the line. A seventh section concerned river crossings, but is not here involved. Attached to the specifications was a map showing the general outline of each section of the proposed pipe line. Oklahoma received the contracts to construct Sections 1, 4, 5, and 6. Separate contracts were executed to cover each section and consisted of some three or four typewritten pages which referred to, and incorporated, the specifications furnished at the time the bids were invited.

These specifications provided that Magnolia should furnish "all pipe, casing, primer, doping materials, wrappers, gate valves, fittings, vent pipe and other materials to be used in the construction of said pipe line, excepting welding rods" and Magnolia was obligated to deliver "such pipe and other materials which are to become a part of said line f. o. b. cars at Railroad Stations, Pump Stations, or railroad sidings advantageously located near the right of way", but the contractor was to move the pipe to the actual location. Under the provisions of this section of the specifications, headed "Materials Company Shall Furnish", is contained a purported schedule of delivery of pipe which forms the substantial basis of Magnolia's defense to Oklahoma's counter-claim. Because of its materiality it is set forth in full.[1] Under the heading, "Time for Starting and Completing Work" time for starting of either section was provided as five days after the time the company notified the contractor that sufficient pipe would be delivered to complete five miles of line, and a specified

[1] "'Present schedule of delivery of pipe as furnished by pipe supplier is as set out below and the deliveries applicable to each section is as indicated:

"'20" O. D. Line Pipe

| | 5/16" Wall | 1/2" Wall |
|---|---|---|
| **Section 1:** | | |
| May | 45.00 miles | |
| June | 40.00 miles | |
| July | 16.71 miles | |
| August | | 7.00 miles |
| | 101.71 | |
| **Section 2:** | | |
| May | 44.00 miles | |
| June | 40.00 miles | |
| July | 8.58 miles | |
| August | | 15.50 miles |
| | 92.58 | |
| **Section 3:** | | |
| June | 48.00 miles | |
| July | 48.69 miles | |
| August | 23.00 miles | 1.60 miles |
| | 119.69 | |
| **Section 4:** | | |
| July | 55.02 miles | |
| August | | 1.32 miles |
| September | 13.49 miles | 2.74 miles |
| | 68.51 | 4.06 |
| **Section 5:** | | |
| September | 4.51 miles | 5.09 miles |
| October | 41.00 miles | |
| November | 29.00 miles | |
| December | 28.00 miles | |
| January | 11.10 miles | |
| | 113.61 | |
| **Section 6:** | | |
| September | | 6.17 miles |
| October | 16.00 miles | |
| November | 28.00 miles | |
| December | 29.00 miles | |
| January | 41.51 miles | |
| | 114.51 | |
| **Section 7:** | | |
| August | | 2.08 miles' " |

195 F.2d—25½

number of calendar days was provided for completion. The concluding paragraph of this section is directly material to the issues and is set forth in full.[2] In this connection, each typewritten contract contained a paragraph as set forth below.[3] Each of the contracts, the four covering the four sections which Oklahoma assumed to construct, and the two covered by contracts with others, was bid and contracted on a price per foot as to the separate sections and typewritten provisions of each contract placed the consideration to be paid by Magnolia as the amount thus computed. Oklahoma commenced construction on Section 1 on June 2nd, 1947. The record is replete with evidence as to subsequent transactions between the parties and the methods and times in which work was begun, but required to halt on Section 4, because of the lack of pipe, on September 23rd, 1947. Oklahoma contends that this shut-down projected the time of work on Sections 5 and 6 into the period of winter weather with consequent construction difficulties at increased costs which damaged it in the amount sued for. In the present litigation, the main point at issue between the parties is the proper construction of the contracts referred to. The question really arises from the contention of Oklahoma that, since, at the time it was forced to cease its operations there was approximately 100 miles of pipe located at railheads near and on Sections 2 and 3 which were not then necessary for those operations, that Magnolia should have granted its request that the pipe be moved to Section 4 so it could proceed there and that pipe thus delivered could have been replaced with pipe later obtainable and under order for Section 4. Mag-

nolia contends that in accordance with the specifications and contract the pipe had been delivered to the contractors of Sections 2 and 3 in accordance with the schedule and thus could not be removed, since it was not known when it could be replaced and if it were removed Magnolia would be liable to contractors on those sections for any damages caused by delay. Oklahoma vigorously asserts that the contract recognizes a clear difference between the pipe delivery schedule from the "pipe supplier to Magnolia", and the contractual obligation of Magnolia to furnish Oklahoma with pipe, as needed, after Magnolia received the pipe from the pipe supplier. It construes the "present schedule of delivery of pipe as furnished by pipe supplier", set forth above, as being a matter between Magnolia and the supplier, and that the exculpatory clause purports to release Magnolia for delay or work stoppage only in case the pipe supplier fails to deliver or if Magnolia is unable to furnish the materials as needed for any other reason beyond its control. Consequently, since Magnolia had been delivered pipe sufficient to supply Oklahoma needs it should have done so, and is liable for damages caused by a delay thus occasioned. Magnolia replies that the terms of the contract and specifications as a whole clearly show that the exculpatory language relates to the schedule and failure of delivery to it by the suppliers as thus alloted to each section and that since it is undisputed that as to the sections involved in Oklahoma's contracts the pipe was not so supplied the delay is clearly within the terms of the contract excusing it from any liability for damages. Our consideration of the contract leads to the

2. "It is understood, however, that in view of the uncertainty of the delivery of the pipe and materials going into this work, in the event the Company is unable to furnish the materials as needed for any reason beyond the control of the Company, then such time shall be deducted from such period and Company shall not be liable for damages for any such delay. The schedule for the delivery of the pipe by the pipe suppliers as furnished Company at time these specifications are sub-

mitted for bids is as indicated in Section IV of these specifications entitled 'Materials Company Shall Furnish.' "

3. "4. It is further understood and agreed that Contractor shall have no claim of any character whatsoever for damages for delay or work stoppage due to failure of pipe supplier to deliver pipe to Company according to the present schedule of delivery or if Company is unable to furnish the materials as needed for any other reason beyond its control."

conclusion that the contention of Magnolia is correct and that under the terms of the contract and the undisputed facts Magnolia is not liable to Oklahoma for its damage sustained as a result of the delay in procuring the pipe necessary to the construction of Section 4, nor for such damages as may have been thereafter sustained by the projection of period of construction of Sections 5 and 6 into during the winter season. It seems clear that the "present schedule of deliveries" set forth in the specifications is, and must be, the "present schedule of delivery" referred to in the clause of the contract providing that Oklahoma should have no claim for damages for delay or work stoppage due to failure of pipe supplier to deliver pipe to Magnolia. These provisions of the contract qualify and override the words "as needed", upon which Oklahoma relies, and we think must have been so understood by the contracting parties. Considering the contract as a whole, we are unable to read into it any contractual obligation upon the part of Magnolia to furnish the contractor with pipe and other materials, as needed, for the construction of the respective sections. On the contrary, we think that the recognition and statements in the specifications "of the uncertainty of the delivery of pipe", and the clear statement in the specifications of the months within which the deliveries "applicable to each section" is indicated, with the substantially same language in the exculpatory provision of the contract, shows that any damages incident to the delay in question are expressly within the provision that such delay would give rise to no claim "of any character whatsoever for damages." We have not mentioned the collateral and subsidiary features of this case which are strongly urged by the parties because of the controlling result which follows the proper construction of the contract. Both parties concede that the contract is unambiguous and differ only in their respective contentions of the construction it should receive and the legal effect of the facts upon which Oklahoma's claims for damages are predicated.

■ The trial Court did not abuse its discretion in overruling the motion of Oklahoma to dismiss the suit for declaratory judgment and damages instituted by Magnolia. This complaint recited the execution of the contracts referred to and the performance of the work thereunder and collateral undertakings begun and carried out during the course of performance, as well as additional consideration paid, extra work performed, and dispute as to liability for payment for this and other matters of accounting between the parties. It sought a declaration of the respective obligations of the parties and, in addition, prayed judgment against Oklahoma for some $268,000 which it was claimed Magnolia had paid above the contract price in order to induce Oklahoma to perform work which it was already obligated to do. Prior to the filing of this suit Oklahoma had instituted a suit to perpetuate testimony with a view to filing actions for damages against Magnolia in the State Courts of Texas, in which Magnolia is domiciled. Such suits were instituted subsequent to the filing of the declaratory judgment proceeding. Diversity of citizenship existed in this latter because Oklahoma is a corporation of the State of Delaware. By its motions to dismiss Oklahoma contended that the declaratory judgment proceeding was improper in that all of the contracts had been fully performed; that such liability as had accrued already existed and that Magnolia's liability under the executed contracts could not be made any greater or any less by any present or future act or omission by Magnolia and constituted only an effort to adjudicate the validity of Magnolia's defenses to Oklahoma's damage claim, and was an attempt by Magnolia to select its forum in a case in which removal proceedings of the five State Court actions were not available to it and was an effort to circumvent the jurisdiction of the State Courts. Had the declaratory judgment proceeding related only to the opposing claims for damages already existing and arising out of contracts fully performed there would be substantial merit in Oklahoma's claim that the matter was not

one which the Court should have entertained. However, clearly the Court had jurisdiction of the claim for recovery of the $268,000 and the dismissal of the declaratory judgment feature of the case would have left this cause still pending. By retaining jurisdiction of the complaint as a whole and determining the merits of the claim for money judgment asserted, arising out of the same series of transactions, all items of controversy between the parties were settled in one litigation. Under the circumstances of this case we find no reversible error in the order of the trial Court overruling the motions to dismiss.

The constitutional right of a litigant to have a jury pass upon the facts in actions at common law is, of course, in no way modified or affected because demanded by a counter-claiming defendant in a declaratory judgment proceeding. Any party asserting rights in an action at common law, whether affirmatively or defensively, whether by complaint or counterclaim, in a declaratory judgment action or other proceeding, is entitled, upon demand, to have a jury pass upon any issue triable of right by a jury.[4] Proper regard for the importance of this right discloses the danger of any retrospective weighing of injury resulting from the improper denial of trial by a jury. Where rights are asserted in actions at common law within the constitutional provisions the proper course is for the Court to place the case upon the jury docket as provided by the Federal Rules of Civil Procedure, 28 U.S.C.A.[5] The trial Court should have done so in this case. Nevertheless, under the circumstances here present, in view of the construction we have given the provisions and effect of the contract entered into between the parties, while we notice the error, we do not reverse because of it, since it is clear that a new trial before a jury would be futile.

For the reasons stated, we find no error in the record which requires reversal and the judgment of the trial Court is affirmed.

Judgment affirmed.

4. Rule 57, Federal Rules of Civil Procedure.

5. Rules 38 and 39, Federal Rules of Civil Procedure.